# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
August 22, 2023
Lyle W. Cayce
Clerk

No. 22-30143

___

Nyron Harrison; Et al.,

*Plaintiffs*,

Louisiana State,

*Intervenor Plaintiff—Appellant*,

versus

Jefferson Parish School Board, Dr. James Gray;

*Defendants-Intervenor Defendants—Appellees*,

___

Timothy Brown,

*Plaintiff*,

Louisiana State,

*Intervenor Plaintiff—Appellant*,

versus

Jefferson Parish School Board; Dr. James Gray,

*Defendants-Intervenor Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC Nos. 2:20-CV-2916, 2:21-CV-40

_____

Before Elrod, Haynes, and Willett, *Circuit Judges*.

Don R. Willett, *Circuit Judge*:

Treating the petitions for rehearing en banc as petitions for panel rehearing, the petitions for panel rehearing are DENIED. Because no panel member or judge in regular active service requested an en banc poll,[1] the petitions for rehearing en banc are DENIED. We withdraw our previous opinion, reported at 74 F.4th 712, and substitute the following:

The Jefferson Parish School Board (JPSB) separately suspended two students for individually having a BB gun visible during virtual school. Each student's family sued the school board, in part seeking a declaration that the school board's virtual learning disciplinary policy is unconstitutional. Louisiana intervened, agreeing with the families on the constitutionality of JPSB's policy and separately challenging JPSB's disciplinary actions as ultra vires. JPSB settled with the families, ending the private suits. Louisiana wants to continue the case, citing its broad interest in compliance with its laws. The question before us is whether Louisiana has standing to do so.

This case lies outside the limits of Article III standing. States undoubtedly have an interest in enforcing their laws. But when it comes to federal courts, Louisiana must claim an injury to a traditional, sovereign interest to invoke Article III jurisdiction. The two are distinctly dissimilar. Louisiana fails to point to "any precedent, history, or tradition" establishing that its interest in compliance with its laws is the equivalent of an Article III

_____

[1] Fed. R. App. P. 35; 5th Cir. R. 35.

sovereign interest in maintaining its right to govern in the face of competing authority.[2] The state similarly fails to establish an injury to an established quasi-sovereign interest sufficient to show *parens patriae* standing. Louisiana's claim of injury to a proprietary interest also falls short.

As we conclude that Louisiana does not have Article III standing, we follow our statutory directive and REMAND the case to the district court to send back to the capable Louisiana state courts.

I

Because of COVID, Ka'Mauri Harrison and T.B. were relegated to attending fourth grade and sixth grade, respectively, virtually. On different virtual school days, Ka'Mauri and T.B. individually had a BB gun on camera. Ka'Mauri was trying to move one out of the way. T.B. held one in the background during a break. Each student's principal referred the student to JPSB for expulsion for violating the school's weapon policy. Each student had a hearing before the JPSB. After the hearings, the JPSB converted the expulsions to suspensions. The students' parents tried to appeal the suspensions, but JPSB denied the appeals, stating that appeals were only available to students who were expelled.

The Louisiana Legislature subsequently passed H.B. 83 ("Ka'Mauri Harrison Act") to address the rights of students that "have been expelled or suspended for doing what would be considered normal at home." The Act provides for the right of review, first to the school board and then to the district court for the parish in which the school is located, when a student is recommended for expulsion, regardless of whether the student is ultimately

---

[2] *United States v. Texas*, 143 S. Ct. 1964, 1970 (2023); *see also id.* (noting that "the Court has examined 'history and tradition,' among other things, as 'a meaningful guide to the types of cases that Article III empowers federal courts to consider'").

expelled. It also requires school boards to adopt specific disciplinary policies for virtual learning that are "narrowly tailored to address compelling government interests" and "the students' and their families' rights to privacy and other constitutional rights while at home or in a location that is not school property." The Act applies retroactively to "recommendation[s] for expulsion [that were] reduced to a suspension, for behavior displayed while participating in virtual instruction . . . between March 13, 2020, and December 31, 2020."

Before the Governor signed the act into law, JPSB approved an Interim Virtual Discipline Policy, which subjected virtual students to the same laws and policies as they would encounter in a physical classroom. Still, after the Governor signed the Act into law, JPSB reviewed Ka'Mauri's and T.B.'s suspensions, ultimately affirming them.

Each family sued JPSB in state court, Ka'Mauri's in October 2020 and T.B.'s in December 2020. The complaints raised state and federal constitutional and several tort claims and requested a declaration that JPSB's policies and the state school discipline statute[3] are unconstitutional. JPSB removed both suits to federal court.

Louisiana moved to intervene. The district court granted Louisiana leave to intervene as a matter of right because the suit challenged the constitutionality of a state statute. In its intervenor complaint, Louisiana alleged that JPSB is violating state and federal law in several ways, mainly by: (1) "acting ultra vires" in its disciplinary policies and actions; (2) violating several Louisiana statutes and (3) violating students' and their parents' due process rights under the state and federal constitutions. JPSB counterclaimed, alleging that the Ka'Mauri Harrison Act violates its due

---

[3] La. Rev. Stat. § 17:416.

process rights under Article I, § 2 of the Louisiana constitution and the Fourteenth Amendment to the federal constitution.

JPSB ultimately settled with the families and entered into a stipulation of dismissal of all the families' claims. JPSB maintained its counterclaim under the stipulation but later voluntarily dismissed the claim. With only Louisiana's claims remaining, JPSB moved for judgment on the pleadings.

The district court granted JPSB's motion, holding that Louisiana lacked standing. The court read Louisiana's briefing as only asserting standing in its *parens patriae* capacity. It concluded that Louisiana failed to satisfy the doctrine's requirements because the state failed to show a quasi-sovereign interest in protecting students from JPSB's alleged discrimination and that its alleged injury affects a substantial portion of its population.[4] Summing up, the court stated, "Absent any concrete Article III injury that is sufficient to invoke this Court's jurisdiction, the Court cannot wade into this dispute between the State and its political subdivision over the administration of Louisiana schools."[5]

Louisiana filed this timely appeal. In the state's view, it has Article III standing to sue to protect its citizens against JPSB's alleged discriminatory disciplinary policies in a direct and a *parens patriae* capacity. Alternatively, Louisiana asks that, if we hold that it does not have standing, we remand the case to the district court with instructions for the district court to remand the case to state court.

---

[4] *See* 2022 WL 539277, at *10–13 (E.D. La. Feb. 23, 2022).

[5] *Id.* at *13.

No. 22-30143

II

Article III of the Federal Constitution confines our authority to "Cases" and "Controversies."[6] To establish that a suit falls within this limit, a plaintiff must show (1) an injury in fact that (2) is fairly traceable to the conduct complained of and (3) redressable by a favorable judicial decision.[7] "States are not normal litigants for the purposes of invoking federal jurisdiction."[8] But they, too, are bound by Article III's standing requirements.

The Supreme Court has explained that states have at least four types of interests that, if injured, satisfy standing's first requirement: sovereign, quasi-sovereign, proprietary, or private.[9] Plus, states can sue in multiple capacities. They may sue on behalf of themselves or in the interest of their residents in a *parens patriae* capacity. The capacity in which the state is suing changes the standing calculus.[10]

For direct suits, a state "need meet only the ordinary demands of Article III—that is, establish injury-in-fact, causation, and redressability."[11] In these suits, states can vindicate their sovereign, proprietary, or private interests. For *parens patriae* suits, however, states, "must do more than meet

---

[6] U.S. Const. art. III, § 2.

[7] *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

[8] *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

[9] *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601–02 (1982).

[10] *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 178 (D.C. Cir. 2019) (quoting Erwin Chemerinsky, Federal Jurisdiction 121 (7th ed. 2016) ("[A] distinction must be drawn between a government entity suing to remedy injuries that it has suffered and suing in a representative capacity on behalf of its citizens.")).

[11] *Id.*

Article III's irreducible minimum; [they] must assert a quasi-sovereign interest 'apart from the interests of particular private parties.'"[12]

Louisiana asserts that it has standing to sue in both capacities to vindicate three of those interests. First, Louisiana argues that it has a sovereign interest in its subordinates obeying state and federal law. Second, if that direct-standing theory fails, Louisiana asserts it has proprietary standing to ensure that JPSB follows the law and doesn't risk losing any school funding. Third, Louisiana argues that it has *parens patriae* standing to vindicate its quasi-sovereign interest in protecting its citizens from discrimination.

History and tradition guide our analysis today because "[a] 'telling indication of the severe constitutional problem' with [a state's] assertion of standing to bring this lawsuit 'is the lack of historical precedent' supporting it."[13] So we start there in addressing each of Louisiana's standing theories. Ultimately, each of Louisiana's bases for standing comes up short in establishing an injury-in-fact.

A

We start with Louisiana's claim that JPSB's actions injured a sovereign interest. For much of the Supreme Court's history, states could not sue to vindicate a sovereign interest. "From the Founding through the end of the nineteenth century, States could sue in federal court only to vindicate their 'common-law interests,' their property or contract rights."[14]

---

[12] *Id.* (quoting *Snapp*, 458 U.S. at 607).

[13] *Texas*, 143 S. Ct. at 1970 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010)).

[14] *Saginaw County v. STAT Emergency Med. Servs, Inc.*, 946 F.3d 951, 956 (6th Cir. 2020) (Sutton, J.) (quoting Ann Woolhandler & Michael G. Collins, *State Standing*, 81 Va. L. Rev. 387, 392–93 (1995)); *see also, e.g.*, *Fowler v. Lindsey*, 3 U.S. (3 Dall.) 411, 412 (1799)

Put differently, the federal courts were only available for states for "common-law or equity actions similar to those of ordinary litigants."[15]

Post-*Lochner*, the Supreme Court "loosened some of these standing limitations, permitting states 'to depart from the common-law menu of litigable claims' and to pursue their interests as sovereigns directly."[16] But what has traditionally counted as an injury to a sovereign interest does not include every act of disobedience to a state's edicts.

The Supreme Court has identified two clear sovereign interests: "First, the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal; second, the demand for recognition from other sovereigns—most frequently this involves the maintenance and recognition of borders."[17] We have given several examples of the first type of injury: "(1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law, at least where the state statute at issue regulates behavior or provides for the administration of a state program and does not simply purport to immunize state citizens from federal law."[18] And we recently explained that "States have sovereign interests by virtue of their

---

(declining to exercise jurisdiction because the state's "right of jurisdiction" was an issue of sovereignty); *Georgia v. Stanton*, 73 U.S. (6 Wall.) 50, 76 (1867) (declining jurisdiction because "merely political rights . . . do not belong to the jurisdiction of a[n Article III] court, either in law or equity.").

[15] Ann Woolhandler & Michael G. Collins, *Reining in State Standing*, 94 Notre Dame L. Rev. 2015, 2015 (2019).

[16] *Saginaw County*, 946 F.3d at 957 (quoting Woolhandler & Collins, 81 Va. L. Rev. at 393).

[17] *Snapp*, 458 U.S. at 601.

[18] *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (cleaned up).

being co-sovereigns in our Nation's federalism."[19] Given that the roots of these interests are found in federalism, for a sovereign interest to serve as a cognizable injury for federal standing, "'the acts of the defendant . . . [must] invade the [government's] sovereign right,' resulting in some tangible interference with its authority to regulate or to enforce its laws."[20] This is where Louisiana's theory goes wrong.

Louisiana contends that "[w]hen JPSB officials adopt unconstitutional policies and practices, . . . they risk undermining public confidence in the State . . . [and] interfere with the performance of the obligation of executive officers of the State to uphold and enforce those rights." Louisiana's assertion that it has a sovereign interest in its subordinates following the law facially has merit. But Louisiana is not hindered from enforcing its laws against JPSB. The state may use its full arsenal of enforcement mechanisms to force JPSB to comply with state law.

The Sixth Circuit recently faced a similar assertion of sovereign injury in *Saginaw County v. STAT Emergency Medical Services, Inc.* There Saginaw County sought to preempt suit by an ambulatory service by seeking a declaration that its contract with its existing, competing service was valid.[21] The Sixth Circuit dismissed the suit, holding that the County failed to assert any Article III injury. The court first noted that injuries to the state "conventionally arise" when the state "has enacted a law, enforced it against a resident, and the resident has refused to comply. Then and only then, it would seem, does the sovereign sustain a cognizable injury—at least when it

---

[19] *Louisiana v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 877 (5th Cir. 2023).

[20] *Saginaw County*, 946 F.3d at 957 (quoting *Missouri v. Holland*, 252 U.S. 416, 431 (1920)).

[21] *Id.* at 954.

comes to enforcing public rights."[22] So "someone violat[ing] a law . . . does not by itself injure the government in an Article III way. Only 'actual or threatened interference with [its] authority' does."[23]

The Seventh Circuit similarly held that Illinois did not have standing to sue Chicago over Chicago's agreement with Gary, Indiana, to create an airport authority under a state statute because Illinois's assertion that the fact that its "laws have been preempted is injury to a sovereign" failed to create a cognizable injury.[24] The court emphasized that "the city exists at the state's sufferance" so Illinois could use its full quiver of powers to force Chicago into compliance.[25]

Likewise here, Louisiana's purported sovereign injury is that JPSB is allegedly violating state and federal law. Such a violation does not become an injury until Louisiana brings an enforcement action against JPSB to bring JPSB into compliance with the law, and JPSB or another entity hinders the state from doing so. Only then would there exist a controversy for us to resolve within the limits of federalism.[26] The state attempts to invoke federal

---

[22] *Id.* at 956.

[23] *Id.* (quoting *United States v. West Virginia*, 295 U.S. 463, 473 (1935)).

[24] *Illinois v. City of Chicago*, 137 F.3d 474, 477 (7th Cir. 1998).

[25] *Id.* at 476; *see also id.* ("Illinois could reclaim the powers Chicago now exercises, and the fact that the balance of political power in Illinois may render this impossible at the moment is a poor reason for a federal court to readjust the allocation of functions between the city and the state.").

[26] *See Saginaw County*, 946 F.3d at 958 (citation omitted) ("The conventional route for resolving state enforcement actions is to let the state counties or agencies clarify how the law works in state court before a federal constitutional challenge ripens for resolution. That won't happen if either side can sue first in federal court before the contours of the local enforcement action take shape.").

jurisdiction to enforce mostly state law against a subordinate. Neither history nor tradition supports the use of our Article III judicial power in this way.

We are unpersuaded by Louisiana's arguments and citations to the contrary. Most of the cited cases are federal enforcement actions brought in federal court and are thus inapposite.[27] And in *Texas Office of Public Utility Counsel v. F.C.C.*, the state agencies claimed in part that the federal government's actions infringed on their ability to regulate intrastate telecommunications.[28] Louisiana does not face any such infringement here. JPSB has allegedly violated the law. Violating the law is different from hindering its enforcement. We would not say a criminal defendant's mere disobedience of state or federal law hindered the respective government's enforcement of it. More to the point, when speaking about the sovereign's interest in enforcing its laws, the Supreme Court has spoken about the state's interest in the *enforceability* of its laws. In *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, the Court noted that "the power to create and enforce a legal code" is "regularly at issue in constitutional litigation."[29] No such challenge to the

---

[27] *See, e.g.*, *Vermont Agency of Nat. Res. v. United States,* 529 U.S. 765, 771 (2000) (qui-tam action against state agency) ("It is beyond doubt that the complaint asserts an injury to the United States—[]the injury to its sovereignty arising from violation of its laws (which suffices to support a criminal lawsuit by the Government)."); *EEOC v. Bd. of Supervisors for Univ. of La. Sys.*, 559 F.3d 270, 273 (5th Cir. 2009) (holding federal government had an interest in ensuring that the state complied with federal law); *see also, e.g.*, *United States v. City of Jackson*, 318 F.2d 1, 14 (5th Cir. 1963) ("When a State, not by some sporadic act against a particular individual but by a law or pattern of conduct, takes action motivated by a policy which collides with national policy as embodied in the Constitution, the interest of the United States 'to promote the interest of all' gives it standing to challenge the State in the courts.").

[28] *Texas Off. of Pub. Util. Couns. v. F.C.C.*, 183 F.3d 393, 408, 449 (5th Cir. 1999) (challenging an FCC's assertion of authority to refer telecommunications carriers to the states to seek recovery of certain intrastate contributions).

[29] *Snapp*, 458 U.S. at 601; *see also Saginaw County*, 946 F.3d at 956 ("A government's interest in the resolution of contested legal questions before an Article III

enforceability of Louisiana's law is present here. So like the Sixth and Seventh Circuits, we also hold that JPSB's alleged failure to follow state and federal law is not currently injuring Louisiana's sovereign interest.

B

Louisiana next asserts that, even if it lacks direct standing, it has *parens patriae* standing because it has a "quasi-sovereign interest in preventing its political subdivisions from violating the constitutional rights of 52,000 public schoolchildren." In *Snapp*, the Supreme Court stated two hard-and-fast limits on the *parens patriae* doctrine. To invoke the doctrine a state must show that it has "[a] quasi-sovereign interest" that is "sufficiently concrete to create an actual controversy between the State and the defendant" and (2) the injury to that interest affects a "sufficiently substantial segment of [the state's] population."[30] Louisiana's allegations fail at the first prong.

The definition of quasi-sovereign interest is not "simple or exact."[31] The Court has explained that "[o]ne helpful indication in determining whether an alleged injury . . . suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers."[32] And "the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party."[33] The classic example of suits vindicating sovereign interests are those involving

---

tribunal, including those concerning the limits of its own power, thus extends only as far as the actual or threatened invasion of its sovereign right to enforce the law.").

[30] 458 U.S. at 602, 07.

[31] *Id.* at 601.

[32] *Id.* at 607.

[33] *Id.*

public nuisances[34] and economic interests.[35] In those cases, the state is not suing simply to protect the interests of a private citizen, but the interest of the state to be free from the invasion of out-of-state nuisances or discriminatory policies that threaten the state's economy.[36]

Louisiana's asserted interest here is wholly derivative of the interests of JPSB's students. Louisiana is not asserting a separate injury such as being denied its full participation in the federal system, nor does it allege injury to its citizens health or economic well-being in a way that also implicates its own interests. And, again, individual students can sue to get relief from JPSB's alleged discrimination.[37]

*Snapp*, Louisiana argues, establishes that its interest *is* a quasi-sovereign interest under the *parens patriae* doctrine. In *Snapp*, Puerto Rico sued Virginia apple growers for discriminating against its workers by

---

[34] *See, e.g.*, *North Dakota v. Minnesota*, 263 U.S. 365 (1923) (flooding); *Wyoming v. Colorado*, 259 U.S. 419 (1922) (diversion of state waters); *New York v. New Jersey*, 256 U.S. 296 (1921) (discharging sewage); *Kansas v. Colorado*, 206 U.S. 46 (1907) (diversion of state waters); *Georgia v. Tenn. Copper Co.*, 206 U.S. 230 (1907) (noxious gas).

[35] *See Pennsylvania v. West Virginia*, 262 U.S. 553 (1923) (giving certain states preferential right of purchase of gas); *see also Kentucky v. Biden*, 23 F.4th 585, 596 (6th Cir. 2022) ("The classic cases involve public nuisances, in which a state sues to prevent pollution that not only injures its citizens but also invades the state's prerogative to superintend the public health.").

[36] *See, e.g.*, *Tenn. Copper Co.*, 206 U.S. at 236–37 (noting Georgia's allegation that Tennessee's pollution inflicted "a wholesale destruction of forests, orchards, and crops" and holding that, even though Georgia did not own most of the affected property, it had a quasi-sovereign interest in the "earth and air within its domain"); *Georgia v. Penn. R.R. Co.*, 324 U.S. 439, 450 (1945) ("If the allegations of the bill are taken as true, the economy of Georgia and the welfare of her citizens have seriously suffered as the result of this alleged conspiracy" to fix railroad freight rates).

[37] *See Missouri v. Harris*, 847 F.3d 646, 652 (9th Cir. 2017) (noting that courts have held that "*parens patriae* standing is inappropriate where an aggrieved party could seek private relief").

discriminatorily hiring, treating harshly, and firing workers from Puerto Rico.[38] The Court held that Puerto Rico had *parens patriae* standing in part because it had an "interest in securing residents from the harmful effects of discrimination."[39]

Present in *Snapp* but missing here is an injury that emanates outside the state's sovereign authority. As the First Circuit explained, the discrimination in *Snapp* implicated Puerto Rico's interest in "full and equal participation" in the federal system.[40] Otherwise, Puerto Rico would have simply been asserting the interests of the citizens and thus its interest would not have satisfied the requirement that the state assert "interest[s] apart from the interests of particular private parties."[41] This vindication of Puerto Rico's interest in protecting its citizens against discrimination from *a state* could only occur in federal court. No such federalism concern is present here. Louisiana has the power to right JPSB's violations without the help of the federal courts.[42] Indeed, Louisiana has already corrected JPSB's allegedly discriminatory policies through legislation.

---

[38] *Snapp*, 458 U.S. at 592–94.

[39] *Id.* at 609.

[40] *Id.*; *see also Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 339 (1st Cir. 2000) ("Although the Court recognized Puerto Rico's interest in avoiding discrimination against its citizens as a quasi-sovereign interest, it did so in the context of describing Puerto Rico's role in the federal system."); *United States v. Johnson*, 114 F.3d 476, 482 (4th Cir. 1997) (noting that Puerto Rico had standing in *Snapp* because the discrimination "impaired [Puerto Rico's] participation in federal employment programs.).

[41] *Snapp*, 458 U.S. at 607.

[42] *Cf. id.* at 603–04 (citing cases recognizing a quasi-sovereign interest standing where the state could not resolve the dispute due to restraints from not being a fully independent sovereign).

Louisiana asks this court to adopt the Third Circuit's pre-*Snapp* decision in *Pennsylvania v. Porter*, which allowed Pennsylvania to sue one of its villages for unconstitutional police conduct.[43] This suit is on all fours with *Porter*, but *Porter* is not on all fours with *Snapp*. Lacking the benefit of *Snapp*, the *Porter* court failed to explain how Pennsylvania suffered an injury separate from the citizens subjected to the alleged police misconduct or an injury that could not have been corrected by legislation. And we can divine no such separate injury. For this and other reasons,[44] *Porter* does not change our view that Louisiana fails to show a quasi-sovereign interest sufficient to create *parens patriae* standing.

C

Louisiana finally tries to satisfy the injury requirement by pointing to its allegations that it has a proprietary interest in JPSB keeping its governmental funding, which turns on its obedience to state and federal law. Only one sentence of Louisiana's Intervenor Complaint alleges that "JPSB's conduct . . . places the State Treasury at risk of irreparable harm."[45] And Louisiana devoted one lone paragraph to its proprietary-

---

[43] 659 F.2d 306, 310 (3d Cir. 1981).

[44] The Third Circuit relied on civil rights cases brought under 42 U.S.C. §§ 1981 and 1983 relating to Pennsylvania's ability to enforce the Fourteenth Amendment. *See id.* at 317 (citing *Pennsylvania v. Brown*, 260 F. Supp. 323, 338 (E.D. Pa. 1966), *vacated and remanded on other grounds*, 373 F.2d 771 (3d Cir. 1967) (en banc); *Commonwealth v. Glickman*, 370 F. Supp. 724 (W.D. Pa. 1974)). The Supreme Court has questioned *Porter*'s conclusion that Pennsylvania had *parens patriae* standing to sue under 42 U.S.C. § 1983. *See Inyo County. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701, 709–10 & n.5 (2003). The Third Circuit alternatively relied on a Pennsylvania law that the court concluded "recognizes the availability of parens patriae relief even when individual relief might also be available." *See id.* at 318. Louisiana does not point to any such state law here.

[45] The district court acknowledged this argument but did not address it. *See* 2022 WL 539277, at *6.

standing argument below, reiterating that it could be exposed to recoupment if JPSB violates state or federal law. Before us, Louisiana argues that its coffers are at risk because, "The State is . . . directly exposed to recoupment for unconstitutional actions by JPSB, as well as down-stream risks from its guarantees of some of JPSB's obligations."

The state's asserted proprietary "alleged harms 'rel[y] on a highly attenuated chain of possibilities.'"[46] Without more, Louisiana's possible exposure to recoupment is uncertain.[47] Louisiana cites no law here or below bolstering its standing in this capacity. Thus the state has failed to offer a sufficient basis for Article III standing, and so we lack jurisdiction over this action.

## III

Louisiana alternatively asks us to remand the case if it holds that Louisiana does not have Article III standing. 28 U.S.C. § 1447(c) provides, "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case *shall* be remanded."[48] We and other circuits have recognized that this statutory provision requires us to vacate the district court's dismissal and instruct the district court to remand the case to

---

[46] *Louisiana v. Biden*, 64 F.4th 674, 682 (5th Cir. 2023) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)).

[47] Louisiana's citation to *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), is not the layup that Louisiana thinks it is. There the Supreme Court affirmed the district court's post-trial finding that reinstatement of a citizenship census question would lower census participation. *Id.* at 2565. But the plaintiffs proved at trial that they suffered an injury from the potential low census participation. *Id.* So that decision says nothing about what constitutes an adequate pleading for proprietary interest purposes.

[48] 28 U.S.C. § 1447(c) (emphasis added).

state court if we hold there is no Article III jurisdiction.[49] Because that condition is met here, we remand the case for the district court to send it back to state court.

IV

Louisiana essentially seeks to bring an enforcement action in federal court against a subordinate largely for violating state law. This case is the same "(non) controversy" that the Sixth and Seventh Circuits have held falls outside of our Article III power.[50] "The federal courts do not sit to resolve intramural disputes among state officials over the bounds of their authority under state law."[51] Why? Because it is not the role of the federal courts to govern the states. Louisiana stands fully capable and ready to enforce its laws, and it can do so in its courts, which "are not bound to adhere" to Article III's requirements.[52]

---

[49] *See Atkins v. CB&I, L.L.C.*, 991 F.3d 667, 672 & 669 n.1 (5th Cir. 2021); *Mack v. USAA Cas. Ins. Co.*, 994 F.3d 1353, 1359 (11th Cir. 2021). JPSB points to *Samuels v. Twin City*, 602 F. App'x 209 (5th Cir. 2015), and *Griffin v. Lee*, 621 F.3d 380 (5th Cir. 2010), for the proposition that § 1447(c) does not apply in the unique situation presented here: when the intervenor joined the case after removal but before dismissal of the original parties' claims. Both *Samuels* and *Griffin* involved post-dismissal interventions. Moreover, the putative intervenor's claim would have destroyed diversity and was below the $75,000 jurisdictional threshold, such that jurisdiction was affirmatively barred by 28 U.S.C. § 1367(b). Thus, in those cases, the district court lacked jurisdiction to entertain the intervenors' claims in the first place. Here, by contrast, Louisiana's joinder as an intervenor was appropriate at the time it occurred, and Louisiana is thus "treated as if [it] were an original party and has equal standing with the original parties." *Brown v. Demco, Inc.*, 792 F.2d 478, 480–81 (5th Cir. 1986) (citation omitted).

[50] *See City of Chicago*, 137 F.3d at 477.

[51] *Cronson v. Clark*, 810 F.2d 662, 665 (7th Cir. 1987).

[52] *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989).

No. 22-30143

We thus AFFIRM the district court's conclusion that Louisiana lacks standing and REMAND the case to the district court with the instruction to remand this case to the state court.